UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION
CASE NO. 1:24-cv-219

**MAKEDA EVANS**,

Plaintiff,

vs.

**PURE AESTHETICS, LLC,**

Defendant.

_____ /

## COMPLAINT

Plaintiff MAKEDA EVANS, by and through undersigned counsel, sues Defendant PURE AESTHETICS, LLC, a Florida Limited Liability Company, and alleges as follows:

1.     This is an action for declaratory and injunctive relief, attorney's fees, costs, and litigation expenses for unlawful disability discrimination in violation of Title III of the Americans with Disabilities Act, 42 U.S.C. §§12181-12189 ("ADA"), as amended, and 28 C.F.R. Part 36.

2.     This Court has jurisdiction over this case based on federal question jurisdiction, 28 U.S.C. §1331, and the provisions of the ADA. Plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202.

3.     Venue is proper in this Court as all actions complained of herein and

1

injuries and damages suffered occurred in the Northern District of Florida.

4.    Plaintiff MAKEDA EVANS is a resident of Alachua County, Florida, is sui juris, and is disabled as defined by the ADA and ADA Amendments Act of 2008, 42 U.S.C. §12101 ("ADAAA").

5.    Plaintiff is, and at all relevant times, has been blind and visually disabled in that Plaintiff suffers from Retinitis pigmentosa and Bardet-Biedl syndrome type 1, which is a permanent eye and medical condition that substantially and significantly impairs her vision and limits her ability to see. Plaintiff thus is substantially limited in performing one or more major life activities, including, but not limited to, seeing, accurately visualizing her world, and adequately traversing obstacles. As such, she is a member of a protected class under the ADA, 42 U.S.C. §12102(1)-(2), the regulations implementing the ADA set forth at 28 CFR §§36.101, *et seq*., and 42 U.S.C. §3602(h). Plaintiff further is an advocate of the rights of similarly situated disabled persons and is a "tester" for the purposes of asserting her civil rights and monitoring, ensuring, and determining whether places of public accommodation and/or their respective and associated websites are in compliance with the ADA and any other applicable disability laws, regulations, and ordinances.

6.    Based on a 2010 U.S. Census Bureau report, approximately 8.1 million people in the United States are visually impaired, including 2.0 million who are blind.

7.    Because she is blind, Plaintiff cannot use her computer without the assistance of appropriate and available auxiliary aids, screen reader software, and/or

other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user. "The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard." *Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

8. Defendant is a Florida Limited Liability Company authorized to do business and doing business in the State of Florida. Defendant owns, operates, and/or controls a medical spa that offers a variety of aesthetic services, including skincare treatments, body sculpting, and laser procedures, the medical spa Plaintiff intended to patronize in the near future (and as early as November and/or early December 2024), which is located at 217 Northwest 76th Drive, Gainesville, FL 32607.

3

9.  Plaintiff's blindness limits Plaintiff in the performance of major life activities, including sight, and Plaintiff requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with her use of a computer.

10.  Plaintiff frequently accesses the internet. Because Plaintiff is blind, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, Plaintiff uses commercially available screen reader software to interface with the various websites.

11.  At all times material hereto, Defendant was and still is an organization that owns, operates, and/or controls a medical spa under the name "Pure Aesthetics". The "Pure Aesthetics" medial spa is open to the public. As the owner, operator, and/or controller of this spa, Defendant is defined as a place of "public accommodation" within the meaning of the ADA because Defendant is a private entity which owns, operates, and/or controls "a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment," per 42 U.S.C. §12181(7)(E) and 28 C.F.R. §36.104(5).

12.  Because Defendant is a location open to the public, the Defendant's physical location is a place of public accommodation subject to the requirements of the ADA, 42 U.S.C. §12182, §12181(7), and its implementing regulations, 28 C.F.R. Part 36.

13.  Defendant also owns, controls, maintains, and/or operates an adjunct

4

website, https://www.pureaestheticsgainesville.com/ (the "Website"). The Website provides information on the location, hours, and contact details of Defendant's medical spa, and offers detailed descriptions of various aesthetic services such as skincare treatments, body sculpting, and laser procedures. Additionally, the Website allows users to book appointments for selected services, purchase skincare products, purchase electronic and physical gift cards, view gallery featuring a before-and-after section showcasing treatment results, discover memberships and register for them online, learn about ongoing specials read blog posts to uncover beauty tips and detailed insights into services, explore client reviews to gain a better understanding of the spa's offerings, discover payment plans and find information on them in the Frequently Asked Questions section, explore career opportunities within the spa, read detailed information about the team, and join the mailing list to receive beauty tips and exclusive special offers.

14.    The Website also services Defendant's physical location by providing detailed information on available services, membership options, special offers, and other information that Defendant is interested in communicating to its customers.

15.    Because the Website allows the public the ability to secure information about the location of Defendant's medical spa, as well as the services offered, book appointments for selected services, purchase skincare products and electronic and physical gift cards, view the gallery featuring a before-and-after section showcasing treatment results, discover memberships and register for them online, learn about

ongoing specials, read the blog to uncover beauty tips and detailed insights into services, explore client reviews to gain a better understanding of the spa's offerings, discover payment plans and find information on them in the Frequently Asked Questions section, explore career opportunities within the spa, read detailed information about the team, and join the mailing list to receive beauty tips and exclusive special offers, the Website has a nexus to, and is an extension of and gateway to services, privileges, and advantages of Defendant's physical location, which is a place of public accommodation under the ADA. As an extension of and service, privilege, and advantage provided by a place of public accommodation as defined under the ADA, the Website is an extension of the services, privileges, and advantages made available to the general public by Defendant at and through its brick-and-mortar location and business. Furthermore, the Website is a necessary service and privilege of Defendant's physical location in that, it acts as a critical point of sale for the location, it enables users of the Website to make purchases of Defendant's services that is also available for purchase in, from, and through its physical location.

16.    Because the public can find information about the location, hours and contact details of Defendant's physical location, analyze medical spa services, view special offers, book appointments for selected services, purchase electronic and physical gift cards, view the gallery featuring a before-and-after section showcasing treatment results, discover memberships and register for them online, learn about

ongoing specials and purchase them, read the blog to uncover beauty tips and detailed insights into services, explore client reviews to gain a better understanding of the spa's offerings, discover payment plans and find information on them in the Frequently Asked Questions section, explore career opportunities within the spa, read detailed information about the team, and join the mailing list to receive beauty tips and exclusive special offers, the Website is an extension of, and gateway to the physical location, which is a place of public accommodation pursuant to the ADA, 42 U.S.C. §12181(7)(E). As such, the Website is a necessary service, privilege, and advantage of Defendant's brick-and-mortar location that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages afforded the non-visually disabled public both online and in the physical location.

17.    At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling the Website. Since the Website is open to the public through the internet, by this nexus the Website is an intangible service, privilege, and advantage of Defendant's brick-and-mortar location that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both online and in the physical location. As such,

Defendant has subjected itself and the Website to the requirements of the ADA.

18.    Plaintiff is and/or has been a customer who is interested in patronizing, and intends to patronize in the near future once the Website's access barriers are removed or remedied (and as early as November and/or early December 2024), Defendant's physical location located at 217 Northwest 76th Drive, Gainesville, FL 32607, and to learn about brick-and-mortar location, analyze medical spa services, book appointment for selected services, purchase gift cards, view the gallery featuring a before-and-after section showcasing treatment results, discover memberships and register for them online, learn about ongoing specials and purchase them, read the blog to uncover beauty tips and detailed insights into services, explore client reviews to gain a better understanding of the spa's offerings, discover payment plans and find information on them in the Frequently Asked Questions section, read detailed information about the team, and join the mailing list to receive beauty tips and exclusive special offers. In the alternative, Plaintiff intends to monitor the Website in the near future (and as early as November and/or early December 2024) as a tester to ascertain whether it has been updated to interact properly with screen reader software.

19.    The opportunity to find information about the location, hours and contact details of Defendant's physical location, analyze medical spa services, book appointments for selected services, purchase skincare products, purchase electronic and physical gift cards, view the gallery featuring a before-and-after section

showcasing treatment results, discover memberships and register for them online, learn about ongoing specials and purchase them, read the blog to uncover beauty tips and detailed insights into services, explore client reviews to gain a better understanding of the spa's offerings, discover payment plans and find information on them in the Frequently Asked Questions section, explore career opportunities within the spa, read detailed information about the team, and join the mailing list to receive beauty tips and exclusive special offers, and more from Plaintiff's home are important and necessary accommodations for Plaintiff because traveling outside of Plaintiff's home as a blind individual is often a difficult, hazardous, frightening, frustrating, and confusing experience. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually disabled individuals using screen reader software.

20.    Like many consumers, Plaintiff accesses a number of websites at a time to help plan her store visits and to compare services, prices, services, sales, discounts, and promotions. Plaintiff may look at several dozen websites to compare features, discounts, services, promotions, and prices.

21.    Beginning in October 2024, Plaintiff attempted on a number of occasions to utilize the Website to browse through the services and online offers to educate herself as to the services, and special offers being offered, learn about the brick-and- mortar location, check spa hours, review available memberships, and explore client reviews with the intent to book an appointment. Plaintiff also

attempted to access and utilize the Website in her capacity as a tester to determine whether it was accessible to blind and visually disabled persons such as herself who use screen reader software to access and navigate company websites.

22.    Specifically, Plaintiff intended to find a medical spa center to analyze their offerings and book an appointment for a wellness and beauty procedure. On or about October 16, 2024, Plaintiff was searching for a local spa center and came across Defendant's website. Using the JAWS screen reader, she attempted to navigate the site and explore its services. However, due to multiple accessibility issues on the website, her navigation was inefficient. When she attempted to book an appointment, the combo boxes for selecting the time failed to announce its name and role. The input field for the date announced only the current date and did not indicate that a calendar appeared after the field received focus. Moreover, the calendar could not be accessed using the Tab key, and no instructions were provided on how to navigate it using the arrow keys. As a result, Plaintiff was unable to book an appointment at the selected spa center.

23.    Plaintiff utilizes available screen reader software that allows individuals who are blind and visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by blind and visually disabled individuals using keyboards and available screen reader software. These barriers are pervasive and include, but are not limited to:

a.    "Skip to content" link was not implemented. Plaintiff was not provided with

the mechanism to bypass repeated blocks of content;

b. The website did not preserve the correct keyboard tabbing (reading) order, causing Plaintiff to perceive an inconsistent version of the webpage. Its layout presented an incorrect sequence and order of interactive elements. Specifically, the first elements to receive focus were from the Content info section;

c. Landmarks were not properly inserted into the home page. Plaintiff tried to navigate the home page using landmarks but could not access its main regions because of landmark inaccurate markup;

d. Plaintiff encountered links that were incorrectly implemented. As a result, the legally blind user could not access the intended destination pages. For example, the "About" and "Services" links in the navigation menu, which had submenus, were announced as links but incorrectly redirected to the same page instead of their respective destinations;

e. The Navigation menu did not allow the repeated content to be expanded or collapsed, and when the sub-menu was collapsed, it was still included in the reading order;

f. The Navigation menu contained elements with drop-down menu, and they did not announce their state - "collapsed" or "expanded". As a result, Plaintiff had difficulty in navigating the menu and could not determine in which part of the sub-menu the keyboard focus was located;

g. The carousel region on the home page contained moving content but lacked a mechanism to pause the movement. A mechanism should be provided to allow users to read the moving content in a static area. This mechanism must be accessible to assistive technologies and operable via the keyboard;

h. Logos and icons were used as links without appropriate alternative text, leaving Plaintiff unaware of their purpose. For example, the navigation icons in the carousel region and the social media logos lacked descriptive alternative text, making it difficult for Plaintiff to understand their function or destination;

i. Interactive elements that functioned as "buttons" were not programmatically implemented correctly. Instead of using the appropriate "role" attribute, they were constructed using tags such as <a> or other incorrect elements. As a result, the screen reader software misinterpreted these elements, causing

confusion for Plaintiff, who received ambiguous information about the element in focus. For example, the buttons for controlling the carousel region were incorrectly announced as links;

j.  Several links on the website had ambiguous text, making their purpose unclear to Plaintiff. The lack of detailed descriptions for link targets and destination pages made it difficult for Plaintiff to understand their function. For example, generic links such as "Learn More" did not provide sufficient context about the content or page they referenced;

k.  Plaintiff encountered interactive images used as links, but the alt text on these images did not convey information that accurately described their purpose or the content of the destination page. This lack of descriptive alt text made it difficult for Plaintiff to understand what kind of information could be found on the linked pages;

l.  Social media links led to other websites and did not indicate that they were external. Plaintiff was disoriented on another website. The link text failed to warn legally blind customers about the significant change of the context;

m. Plaintiff tried to follow the links from the website and received no prior warning that the links opened new windows. As a result, Plaintiff unsuccessfully tried to use the "Back" function of the browser to go to the previous page and became disoriented. For example, this issue occurred with social media links too;

n.  Images on the website (images from the Before-and-After gallery) did not have alternative text, preventing Plaintiff from receiving any description of the non-text content;

o.  Interactive elements on the website could not be accessed using the Tab key, and no helpful instructions were provided on how to navigate these elements using the arrow keys. As a result, Plaintiff was unaware of the calendar that appeared upon focusing on the date field;

p.  Interactive elements on the webpage had inappropriate and non-descriptive names, making it difficult for Plaintiff to identify their purpose. For example, this issue occurred with some combo boxes on the booking page;

q.  The interactive elements on the booking page did not announce their roles. As a result, Plaintiff could not identify the purpose of these interactive elements;

r. Plaintiff encountered combo boxes that did not announce their states. The legally blind customer was not informed about the default values of the combo boxes on the booking page;

s. The errors displayed when Plaintiff entered invalid data into a form field were not announced. The user was not informed which fields were incorrectly completed.

24.    Accordingly, Defendant's Website was incompatible with Plaintiff's screen reading software and keyboard.

25.    The fact that Plaintiff could not communicate with or within the Website left Plaintiff feeling excluded, frustrated, and humiliated, and gave Plaintiff a sense of isolation and segregation, as Plaintiff is unable to participate in the same shopping experience, with the same access to the services, sales, services, discounts, as provided at the Website and in the physical location as the non-visually disabled public.

26.    Plaintiff desires and intends, in the near future once the Website's access barriers are removed or remedied, to patronize Defendant's physical store located at 217 Northwest 76th Drive, Gainesville, FL 32607, and to use the Website, but Plaintiff is presently unable to do so as Plaintiff is unable to effectively communicate with Defendant due to Plaintiff's blindness and the Website's access barriers. Alternatively, as a tester using screen reader software, Plaintiff is unable to effectively access, navigate, and communicate with Defendant through the Website due to Plaintiff's blindness and the Website's access barriers. Thus, Plaintiff and

others who are blind and with visual disabilities will suffer continuous and ongoing harm from Defendant's intentional acts, omissions, policies, and practices as set forth herein unless properly enjoined by this Court.

27.    Because of the nexus between Defendant's physical location and the Website, and the fact that the Website clearly provides support for and is connected to Defendant's physical location for its operation and use, the Website is an intangible service, privilege, and advantage of Defendant's brick-and-mortar location that must comply with all requirements of the ADA, must not discriminate against individuals with disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as afforded the non-visually disabled public both online and in the physical location, which is a place of public accommodation subject to the requirements of the ADA.

28.    On information and belief, Defendant has not initiated a Web Accessibility Policy to ensure full and equal use of the Website by individuals with disabilities.

29.    On information and belief, Defendant has not instituted a Web Accessibility Committee to ensure full and equal use of Website by individuals with disabilities.

30.    On information and belief, Defendant has not designated an employee as a Web Accessibility Coordinator to ensure full and equal use of the Website by

individuals with disabilities.

31.     On information and belief, Defendant has not instituted a Web Accessibility User Accessibility Testing Group to ensure full and equal use of the Website by individuals with disabilities.

32.     On information and belief, Defendant has not instituted a User Accessibility Testing Group to ensure full and equal use of the Website by individuals with disabilities

33.     On information and belief, Defendant has not instituted a Bug Fix Priority Policy.

34.     On information and belief, Defendant has not instituted an Automated Web Accessibility Testing program.

35.     Defendant has not created and instituted a useful and effective Specialized Customer Assistance line or service or email contact mode for customer assistance for the visually disabled.

36.     Defendant has not created and instituted on the Website a useful and effective page for individuals with disabilities, nor displayed a proper link and information hotline, nor created a proper information portal explaining when and how Defendant will have the Website, applications, and digital assets accessible to the visually disabled and/or blind communities.

37.     The Website does not meet the Web Content Accessibility Guidelines ("WCAG") 2.2 Level AA or higher versions of web accessibility.

38.     Defendant has not disclosed to the public any intended audits, changes, or lawsuits to correct the inaccessibility of the Website to visually disabled individuals who want the safety and privacy of purchasing Defendant's services offered on the Website and in the physical location from their homes.

39.     Defendant thus has not provided full and equal access to, and enjoyment of, the goods, services, facilities, privileges, advantages, and accommodations provided by and through the Website and the physical location in contravention of the ADA.

40.     Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

41.     The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life.  That mandate extends to internet e-commerce websites such as the Website at issue in the instant action.

42.     Defendant is, and at all relevant times has been, aware of the barriers to effective communication within the Website which prevent individuals with visual disabilities from the means to comprehend information presented therein.

43.     Defendant is, and at all relevant times has been, aware of the need to provide full and equal access to all visitors to the Website.

44.     The barriers that exist on the Website result in discriminatory and

unequal treatment of individuals with visual disabilities, including Plaintiff.

45.    Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged hereinabove, and this suit for declaratory judgment and injunctive relief is her only means to secure adequate and complete redress from Defendant's unlawful and discriminatory practices in connection with the Website's access and operation.

46.    Notice to Defendant is not required because of Defendant's failure to cure the violations.

47.    Enforcement of Plaintiff's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

48.    Plaintiff has retained the undersigned attorneys to represent her in this case and has agreed to pay them a reasonable fee for their services.

## <u>COUNT I – VIOLATION OF THE ADA</u>

49.    Plaintiff re-alleges paragraphs 1 through 48 as if set forth fully herein.

50.    Pursuant to 42 U.S.C. §12181(7)(E), Defendant is a public accommodation under the ADA and thus is subject to the ADA.

51.    Pursuant to 42 U.S.C. §12181(7)(E), the Website is covered under the ADA because it provides the general public with the ability to find information about the location, hours and contact details of Defendant's physical location, analyze medical spa services, book appointments for selected services, purchase skincare products and electronic and physical gift cards, view the gallery featuring a before-

and-after section showcasing treatment results, discover memberships and register for them online, learn about ongoing specials and purchase them, read the blog to uncover beauty tips and detailed insights into services, explore client reviews to gain a better understanding of the spa's offerings, discover payment plans and find information on them in the Frequently Asked Questions section, explore career opportunities within the spa, read detailed information about the team, and join the mailing list to receive beauty tips and exclusive special offers. The Website thus is an extension of, gateway to, and intangible service, privilege, and advantage of Defendant's physical location. Further, the Website serves to augment Defendant's physical location by providing the public information about the location and by educating the public as to Defendant's available services sold through the Website and in, from, and through the physical location.

52.    Under Title III of the ADA, 42 U.S.C. §12182(b)(1)(A)(II), it is unlawful discrimination to deny individuals with disabilities or a class of individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded to other individuals.

53.    Specifically, under Title III of the ADA, 42 U.S.C. §12182(b)(2)(A)(II), unlawful discrimination includes, among other things, "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities,

privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations."

54.    In addition, under Title III of the ADA, 42 U.S.C. §12182(b)(2)(A)(III), unlawful discrimination includes, among other things, "a failure to take such steps, as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden."

55.    Defendant's Website must comply with the ADA, but it does not as specifically alleged hereinabove and below.

56.    Because of the inaccessibility of the Website, individuals with visual disabilities are denied full and equal access to, and enjoyment of, the goods, information, and services that Defendant has made available to the public on the Website and in the physical location in violation of 42 U.S.C. §12101, *et seq*, and as prohibited by 42 U.S.C. §12182, *et seq*.

57.    Further, Plaintiff has engaged an ADA website compliance expert herein, Robert D. Moody, to review Defendant's Website and confirm that the issues

that Plaintiff encountered on the Website do, in fact, exist and are, in fact, barriers to accessibility for the visually-impaired. Mr. Moody's Expert Declaration is attached to this Complaint as Exhibit "A."

58.    More violations may be present on other pages of the Website, which can and will be determined and proven through the discovery process in this case.

59.    Further, the Website does not offer or include the universal symbol for the disabled that would permit disabled individuals to access the Website's accessibility information and accessibility facts.

60.    There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Examples of such guidelines include, but are not limited to, ensuring the presence of a bypass block, making sure that links have distinctive and non-ambiguous names, and ensuring that interactive elements are properly labeled and their roles are correctly announced. Incorporating such basic components to make the Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to Defendant.

61.    Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to the Website by individuals such as Plaintiff with visual disabilities who require the assistance of screen reader software to comprehend and

access internet websites. Defendant has failed to take any prompt and equitable steps to remedy its discriminatory conduct. These violations within the Website are ongoing.

62.    The ADA requires that public accommodations and places of public accommodation ensure that communication is effective.

63.    According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

64.    According to 28 C.F.R. §36.303(c), public accommodations must furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities: "In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability," 28 C.F.R. §36.303(c)(1)(ii).

65.    Part 36 of Title 28 of the C.F.R. was designed and is implemented to effectuate subtitle A of Title III of the ADA, which prohibits discrimination on the basis of disability by public accommodations, and requires places of public accommodation to be designed, constructed, and altered in compliance with the

accessibility standards established by Part 36.

66.    As alleged hereinabove, the Website has not been designed to interface with the widely and readily available technologies that can be used to ensure effective communication and thus violates the ADA.

67.    As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to its brick-and-mortar location, Plaintiff has suffered an injury in fact by being denied full and equal access to, enjoyment of, and communication with Defendant's Website and its physical location.

68.    Because of the inadequate development and administration of the Website, Plaintiff is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

69.    Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant Plaintiff appropriate and necessary injunctive relief, including an order to:

a)  Require Defendant to adopt and implement a web accessibility policy to make publicly available, and directly link from the homepage of the Website, a functional statement of the Defendant's policy to ensure persons with disabilities have full and equal access to and enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the physical location through the Website.

b)  Require Defendant to take the necessary steps to make the Website readily

accessible to and usable by blind and visually disabled users, and during that time period prior to the Website being made readily accessible, provide an alternative method for individuals with visual disabilities to access the information available on the Website until such time that the requisite modifications are made, and

c) Require Defendant to provide the appropriate auxiliary aids such that individuals with visual disabilities will be able to effectively communicate with the Website for purposes of viewing and locating Defendant's physical location and becoming informed of and purchasing Defendant's services, and during that time period prior to the Website being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through the Website and in the physical location.

70.    Plaintiff is entitled to recover her reasonable attorney's fees, costs, and expenses pursuant to the ADA. To that end, Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action and has agreed to pay them a reasonable fee for their services.

WHEREFORE, Plaintiff requests entry of judgment in her favor and against Defendant for the following relief:

A. A declaration that Defendant's Website is in violation of the ADA;

B. An Order requiring Defendant, by a date certain, to update the Website, and continue to monitor and update the Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, the Website and effectively communicate with the Website to the full extent required by Title III of the ADA;

C. An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within the Website, wherein the logo[1] would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of the Website;

D. An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a Website accessibility coordinator, a Website application accessibility policy, and providing for Website accessibility feedback to ensure compliance thereto;

---

[1]  or similar.

E. An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to its Website;

F. An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for the Website to ensure effective communication for individuals who are visually disabled;

G. An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H. An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, the Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I. An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of the Website to identify any instances where the Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to

send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J.  An Order directing Defendant, by a date certain, to make publicly available and directly link from the Website homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of the Website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K.  An award to Plaintiff of her reasonable attorney's fees, costs and expenses; and

L.  Such other and further relief as the Court deems just and equitable.


DATED: November 22, 2024.


                        **ALEKSANDRA KRAVETS, ESQ.**
                         **P.A.**
                        *Lead Counsel for Plaintiff*
                        1100 Buchanan Street
                        Hollywood, FL 33019
                        Phone: 347-268-9533
                        Email: ak@akesqpa.com

                        By:  ___*/s/ Aleksandra Kravets, Esq.*
                             Aleksandra Kravets, Esq.
                             FBN: 120562